**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DESARIE GIBBS | : |
| | : |
| Plaintiff, | : |
| | : Civ. A. No. 14-134-RGA/MPT |
| v. | : |
| | : |
| CAROLYN W. COLVIN, | : |
| Acting Commissioner of | : |
| Social Security, | : |
| | : |
| Defendant. | : |

**REPORT AND RECOMMENDATION**

## I.   INTRODUCTION

On May 16, 2014, plaintiff Desarie Gibbs ("plaintiff") filed this action against

Carolyn W. Colvin, Acting Commissioner of Social Security, ("defendant") seeking

judicial review of a final decision denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act.[1]  Presently before the court are the

parties' cross-motions for summary judgment.  For the reasons set forth below, the

court recommends plaintiff's motion for summary judgment be denied, and defendant's

cross-motion for summary judgment be granted.

## II.   JURISDICTION

A district court has jurisdiction to review an administrative law judge's ("ALJ")

decision in a Title II DIB case once it becomes the final decision of the Commissioner.[2]

---

[1] *See* 42 U.S.C. §§ 401-433.
[2] 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides.").

A decision of the Commissioner becomes final when the Appeals Council affirms or denies review of an ALJ decision.[3] Here, the ALJ's decision is the final decision of the Commissioner because the Appeals Council denied plaintiff's request for appeal.[4] Therefore, this court has jurisdiction to review the ALJ's decision.

## III.    PROCEDURAL BACKGROUND

On May 5, 2010, plaintiff applied for DIB, asserting a disability onset date of April 15, 2010, and citing sickle cell anemia, beta thalassemia, hypertension, carpal tunnel syndrome, bursitis, and a torn rotator cuff as alleged causes of her disability.[5] The claim was initially denied on November 9, 2010, and upon reconsideration on April 21, 2011.[6] Plaintiff subsequently filed a written request for an administrative hearing before an ALJ on June 20, 2011.[7] On September 25, 2012, ALJ Melvin D. Benitz held a hearing to determine whether plaintiff was disabled.[8] Plaintiff was represented by counsel and testified, and an impartial vocational expert ("VE"), Christina Beatty-Cody, also testified.[9] On October 19, 2012, based on the hearing testimony and the record, the ALJ found plaintiff not disabled within the meaning of the Act[10] and, therefore, not eligible for DIB.[11] The Appeals Council denied plaintiff's request for review.[12] Thereafter, plaintiff brought

---

[3] *See* 20 C.F.R. § 416.1455; *see also* 20 C.F.R. § 404.905.
[4] D.I. 8 at 1.
[5] *Id.* at 128, 137.
[6] *Id.* at 75, 81.
[7] *Id.* at 86-88.
[8] *Id.* at 38-71.
[9] *Id.*
[10] *See* 20 C.F.R. § 404.1520(a) and (g).
[11] D.I. 8 at 20-32.
[12] *Id.* at 1.

the present action seeking judicial review of the Commissioner's final decision.[13]

## IV. FACTUAL BACKGROUND

Plaintiff was 41 years old at the alleged onset date of disability in 2010, 44 years old at the time of the hearing in 2012, and is considered a "younger person" at all times relevant to her DIB application.[14] She completed one year of college, and holds a certificate in medical billing.[15] Her past relevant work includes customer service, data entry clerk, and insurance clerk.[16] Plaintiff stopped working on April 14, 2010, after she was terminated by State Farm Insurance for absences due to her medical problems.[17] In finding plaintiff not disabled, the ALJ also concluded she could no longer perform her previous jobs.[18]

At the time of the hearing, plaintiff lived with her eleven year old daughter, who has cancer and sickle cell disease.[19] Plaintiff receives assistance from her mother, cousin, and sister with household chores, grocery shopping, childcare, and bathing.[20] Plaintiff reported she experiences sickle cell crises about once every other week that last from three to five days.[21] Plaintiff also notes difficulty sitting or standing for prolonged periods, lifting heavy objects, reaching, and concentrating.[22] Due to side

---

[13] D.I. 1 at 1-3.
[14] D.I. 8 at 73; *see also* 20 C.F.R. § 404.1563(c) ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.").
[15] D.I. 8 at 42-43, 138.
[16] *Id.* at 30.
[17] *Id.* at 54-55.
[18] *Id.* at 30.
[19] *Id.* at 43, 61.
[20] *Id.* at 43-46.
[21] *Id.* at 59-60.
[22] *Id.* at 44-53.

effects from her medications, plaintiff claims she is unable to work because of lack of focus and concentration, and an inability "to give 100 percent."[23]

A.    Medical Evidence

Prior to the alleged onset date, plaintiff was diagnosed with sickle cell anemia and beta thalassemia in 2001.[24]  She was diagnosed with carpal tunnel syndrome in both hands in 2008.[25]  On February 10, 2009, Dr. Andrew J. Gelman, D.O., performed surgery to remove a benign tissue mass from her right shoulder.[26]  Plaintiff returned to work within two weeks.[27]  On February 13, 2009, plaintiff, suffering from leg pain, began seeing a pain management specialist, Dr. John J. Goodill, M.D.[28]  Dr. Goodill prescribed OxyContin, Percocet, Dilaudid, and Promethazine.[29]

On August 13, 2009, plaintiff went to the emergency room at Christiana Care Health Services for a sickle cell pain crisis.[30]  Her last hospital admission for a pain crisis was eight years prior.[31]  She was discharged the next day with diagnoses of sickle cell crisis, thrombocytopenia, left hip pain, sclerosis in both humeral heads consistent with avascular necrosis, hypertension, obesity, a history of ventricular ectopy, and microcytic anemia.[32]  Upon discharge, she was instructed to continue with her present

---

[23] *Id.* at 56.
[24] *Id.* at 203.
[25] *Id.* at 472-73.
[26] *Id.* at 173-75.
[27] *Id.*
[28] *Id.* at 264.
[29] *Id.*
[30] *Id.* at 176.
[31] *Id.*
[32] *Id.* at 201.

medications, including OxyContin, Percocet, Dilaudid, and Exforge.[33]

In August 2009, plaintiff started taking Hydroxyurea for severe bone pain, as prescribed by Dr. Philip M. Blatt, M.D., a hematologist.[34]  On April 13, 2010, Dr. Blatt noted no significant improvement in her pain, or increase in hemoglobin F level, since starting Hydroxyurea.[35]  During an April 23 visit with Dr. Goodill, plaintiff reported leg pain and fatigue, and two episodes of sickling pain since the previous visit six weeks before.[36]  On July 12, 2010, plaintiff informed Dr. Goodill because of the loss of health insurance, she could not afford to refill her OxyContin prescription.[37]  Dr. Goodill suggested that she may need to switch from OxyContin to Duragesic if she qualified for Medicaid.[38]  During the interim, she continued with Percocet as needed.[39]

On September 11, 2010, plaintiff was again admitted to the emergency room at Christiana Care Health Services for a sickle cell crisis.[40]  Her pain was managed with intravenous Dilaudid.[41]  She was advised to return on an outpatient basis for treatment with Hydroxyurea.[42]  She was also diagnosed with chronic pain syndrome.[43]  On September 13, during an appointment with Dr. Goodill, plaintiff rated her pain level at "7 [out of] 10."[44]

---

[33] *Id.*
[34] *Id.* at 234.
[35] *Id.*
[36] *Id.* at 245, 249.
[37] *Id.* at 311.
[38] *Id.*
[39] *Id.*
[40] *Id.* at 210.
[41] *Id.*
[42] *Id.*
[43] *Id.* at 213.
[44] *Id.* at 308.

On November 8, 2010, Dr. Anne Aldridge, M.D., a state agency physician, reviewed plaintiff's medical records and completed a physical Residual Functional Capacity ("RFC") assessment.[45] Dr. Aldridge determined plaintiff was able to perform light work with no climbing of ladders, ropes or scaffolds; occasional climbing of stairs and ramps; occasional balancing, stooping, kneeling, crouching, and crawling; occasional overhead reaching with her right upper extremity; and frequent (but not continuous) bilateral handing.[46] Her environmental limitations included avoiding concentrated exposure to temperature extremes, vibration, respiratory irritants, and hazards.[47] Dr. Aldridge noted plaintiff's medical records confirmed a sickle cell related hospitalization approximately once per year, with symptoms responding well to medication.[48] Her carpal tunnel syndrome was only symptomatic with repetitive use of the hands, and her hypertension was controlled.[49] Plaintiff's chronic impingement syndrome "responded only partially to conservative treatment."[50] Dr. Aldridge concluded plaintiff was able to occasionally lift twenty pounds with frequent lifting of up to ten pounds; stand or walk for at least two hours and sit for at least six hours per workday; and push and pull on an unlimited basis.[51]

---

[45] *Id.* at 317-22.
[46] *Id.* at 318-19.
[47] *Id.* at 320.
[48] *Id.* at 322.
[49] *Id.*
[50] *Id.* Plaintiff had declined surgery for this condition.
[51] *Id.* at 318. After the submission of new evidence, Dr. Vinod Kataria of Delaware Disability Determination Services affirmed Dr. Aldridge's findings. *Id.* at 397. The findings were again affirmed by Lakisha Lett, a disability processing specialist, at the SSA's Southeastern Processing Center Operations in Birmingham, Alabama on February 23, 2012. *Id.* at 403.

A November 8, 2010 Social Security "report of contact" noted plaintiff reported her carpal tunnel symptoms increased during work and continuous typing.[52] On December 21, 2010, Dr. Michael W. Lankiewicz, M.D.,[53] a hematologist, recommended upward titration of Hydroxyurea to test whether it would improve her sickle cell disease.[54] On December 27, plaintiff visited Dr. Gregory D. Adams, M.D., her primary care doctor, for complaints of neck and bilateral shoulder pain.[55] Dr. Adams ordered x-rays, which were taken on January 5, 2011, and showed mild degenerative changes of her shoulder joints, and irregular bilateral sclerosis of the humeral heads.[56] On March 16, 2011, Dr. Lankiewicz recommended anti-inflammatory medication after plaintiff reported a pain crisis in her knees.[57] On June 15, 2011, Dr. Lankiewicz noted plaintiff "frequently aborts the Hydroxyurea trial prior to a significant titration."[58] After Dr. Lankiewicz instructed plaintiff on the purpose of continued use of Hydroxyurea to raise fetal hemoglobin levels, the medication was restarted for a full three month trial.[59]

Plaintiff saw Dr. Goodill on August 22, 2011.[60] He noted her chronic pain syndrome resulted in frequent crises every other week lasting three to five days, with plaintiff recently taking twenty to thirty Oxycontin pills to manage pain.[61] On September

---

[52] *Id.* at 146.
[53] Dr. Lankiewicz replaced Dr. Blatt at the same practice. *Id.* at 145.
[54] *Id.* at 367.
[55] *Id.* at 346.
[56] *Id.* at 363.
[57] *Id.* at 366.
[58] *Id.* at 421. Plaintiff claimed she did not understand the process and thought the medication should provide some immediate relief. *Id.*
[59] *Id.*
[60] *Id.* at 571.
[61] *Id.*

14, 2011, plaintiff saw Dr. Lankiewicz with complaints of persistent right groin pain, radiating into the hip, difficulty sleeping and tiredness.[62]  The doctor ordered an MRI of the right hip.[63]  Dr. Lankiewicz noted plaintiff once again discontinued Hydroxyurea on her own, "convinced that it was no help to her."[64]  As a result, the doctor discontinued the Hydroxyurea trial.[65]

The October 20, 2011 MRI revealed avascular necrosis in the pelvic area, with the chronic bone infarcts more pronounced on the left, mild arthritic changes of the hip joints and mild insertional tendinosis of the right gluteus medius.[66]  After discussing the MRI findings with Dr. Lankiewicz on October 24, 2011, plaintiff expressed no interest in a referral to an orthopedic surgeon for her hip avascular necrosis.[67]  However, she mentioned some interest in surgery for carpal tunnel syndrome.[68]  The findings of a sleep study performed by Dr. Goodill which showed moderate sleep apnea were also discussed.[69]  Plaintiff reiterated she awakens with significant pain on a daily basis.[70]  On October 28, 2011, Dr. Goodill provided a note recommending that plaintiff refrain from working for a period of one year, due to disabling pain from sickle cell disease and avascular necrosis of both hips.[71]  On November 16, 2011, Dr. Gelman told plaintiff to use a crutch or cane as needed, lose weight, and advise to when she wanted to

---

[62] *Id.* at 420.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.* at 417.
[67] *Id.* at 419.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.* at 431.

proceed with carpal tunnel surgery.[72]  During a routine visit with Dr. Lankiewicz on February 22, 2012, plaintiff described occasional vaso-occlusive crises which she "manage[d] at home," and low thoracic and lumbar back pain.[73]  Dr. Lankiewicz ordered an MRI of the thoracic and lumbar spine to determine whether there were any new structural lesions.[74]  The MRI of the lumbar spine, completed on March 23, 2012, showed small disc protrusions and facet hypertrophy contributing to mild bilateral foraminal stenosis.[75]

On March 20, 2012, Dr. Lankiewicz completed a "Multiple Impairment Questionnaire" regarding plaintiff's treatment history and status.[76]  Dr. Lankiewicz listed plaintiff's pain as a five, and her fatigue as a seven on a zero-to-ten scale.[77]  He concluded plaintiff could sit for one hour, and stand or walk for zero to one hours in an eight-hour workday, with ambulation every half hour for ten to fifteen minutes.[78]  Dr. Lankiewicz found significant limitation in reaching, handling, fingering, grasping, twisting, pushing, pulling, kneeling, bending, stooping, and lifting or carrying even light items, due to severe pain.[79]  The doctor determined plaintiff's conditions, including constant pain, fatigue, and other symptoms, interfered with her ability to work a full-time competitive job on a sustained basis, and were ongoing (defined as lasting at least

---

[72] *Id.* at 418, 484.
[73] *Id.* at 418.
[74] *Id.*
[75] *Id.* at 556.
[76] *Id.* at 432.
[77] *Id.* at 434.
[78] *Id.* at 434-35.
[79] *Id.* at 435-36, 438.

twelve months).[80]  He found no evidence of malingering.[81]  Dr. Lankiewicz noted plaintiff would need thirty minute breaks three to four times during an eight-hour work day, with at least four absences per month.[82]

On April 11, 2012, Dr. Goodill completed the same questionnaire on plaintiff's behalf, noting "her condition has slowly worsened over time."[83]  On a zero-to-ten scale, her pain was measured at eight, and her fatigue at four.[84]  Dr. Goodill noted plaintiff could stand or walk from zero to one hours, and sit for up to two hours per eight-hour workday.[85]  He recommended plaintiff not sit, stand, or walk continuously, but to ambulate for fifteen minutes every two hours.[86]  The doctor estimated plaintiff could lift and carry zero to ten pounds occasionally, but never lift or carry beyond ten pounds.[87]  He opined her symptoms would likely increase in a competitive environment, and concluded she could not work full-time in a competitive job requiring sustained activity, and would require at least four absences per month due to her frequent and ongoing pain.[88]  He found no malingering.[89]

In early June 2012, plaintiff went to the emergency room for bilateral leg pain, and was discharged after a short stay; she continued to manage her pain at home.[90]

---

[80] *Id.* at 436-37.
[81] *Id.* at 437.
[82] *Id.*
[83] *Id.* at 446.
[84] *Id.* at 442.
[85] *Id.*
[86] *Id.* at 442-43.
[87] *Id.* at 443.
[88] *Id.* at 444-46.
[89] *Id.* at 445.
[90] *Id.* at 527.

On June 25, 2012, plaintiff saw Dr. Lankiewicz, who noted her back pain waxed and waned in intensity, and the MRI failed to identify "any major structural pathology accounting for her pain."[91] Dr. Lankiewicz described plaintiff as reluctant to undergo any weight loss or fitness regimen to address poor strength issues and "significant obesity."[92] Dr. Goodill also discussed weight loss and exercise with plaintiff on June 27, 2012, and continued her pain medication regimen of OxyContin, Endocet, and Ibuprofen.[93] He noted her obstructive sleep apnea was stable with the use of an automatic continuous positive airway pressure (CPAP) machine.[94]

### B.     The Administrative Law Hearing

#### 1.     Testimony of Plaintiff

At the hearing on September 25, 2012, plaintiff testified she lives with her eleven year old daughter, who suffers with cancer and sickle cell disease.[95] Plaintiff worked only five days per month in her previous job, which led to her termination.[96] She testified her height is five feet, four inches, and her weight is 260 pounds, and reported a weight gain of twenty-five to thirty pounds since her termination due to inactivity.[97] She drives frequently, but only for short distances primarily because of hip cramping.[98] Plaintiff's mother does the grocery shopping and helps with the dishes, sweeping, and

---

[91] *Id.*
[92] *Id.* Plaintiff was 5' 4.5" tall and weighed 260 pounds at the time of this examination. *Id.*
[93] *Id.* at 568-69.
[94] *Id.*
[95] *Id.* at 43, 61.
[96] *Id.* at 54-55.
[97] *Id.* at 43.
[98] *Id.* at 43-44.

putting groceries away throughout the month.[99]  A cousin assists with grass cutting, taking out the trash, mopping, and sweeping every three weeks.[100]  Plaintiff stated her sister assists in getting her daughter ready for school when plaintiff suffers a pain crisis.[101]

Because of sleep apnea, plaintiff experiences difficulty with sleeping and resulting tiredness.[102]  She can stand for approximately ten minutes, walk about one block and sit for twenty minutes before experiencing pain.[103]  Plaintiff testified she cannot lift anything heavy, bend, stoop, or sweep.[104]  She has tingling in her hands, which she attributes to carpal tunnel syndrome.[105]

Plaintiff testified that her focus, concentration and short-term memory are impaired by pain medication, which has a "clouding" effect on her.[106]  She is unable to do things she once enjoyed, such as reading and socializing.[107]  She noted pain episodes occur once every two to three weeks, and last up to five days.[108]  During these episodes, she experiences severe leg cramping, limited ambulation, and "locked up" joints accompanied by pain, especially in the knees.[109]  When these symptoms occur,

---

[99] *Id.* at 44-45.  According to plaintiff, her mother does the shopping about three times a month, while plaintiff does the shopping once a month.  *Id.*

[100] *Id.* at 46.

[101] *Id.* at 46-47.

[102] *Id.* at 48.

[103] *Id.* at 50-51.

[104] *Id.* at 51-52.

[105] *Id.* at 53.

[106] *Id.* at 53, 58.

[107] *Id.* at 47.

[108] *Id.* at 49, 53-54.

[109] *Id.* at 49-50.

plaintiff contends she must crawl to ambulate.[110]  Plaintiff claims these crises occur without warning, with varying levels of pain.[111]  She goes to the emergency room when pain is severe and uncontrollable.[112]  Because of her sickle cell disease, high blood pressure, avascular necrosis, carpal tunnel, bursitis, and lack of focus, she would not be dependable and is unable to work a full-time job.[113]

### 2. Testimony of Vocational Expert

Christina Cody, a VE, testified at the hearing.[114]  On questioning by the ALJ, the VE described the exertional requirements and skill level of plaintiff's prior jobs.[115]  The VE identified plaintiff's work experience to be at the 4 or 6 level according to the Specific Vocational Preparation ("SVP"), consistent with the Dictionary of Occupational Titles ("DOT") criteria, which makes her prior work level sedentary to light.[116]  When questioned by the ALJ regarding transferable skills, the VE responded they included plaintiff's keyboarding and clerical experience, which could transfer to sedentary and light exertional positions at the SVP 3 through 5 levels.[117]  The ALJ presented a hypothetical person with the same age, disability onset date, education, and weight as plaintiff, suffering from the same disabilities, limitations, frequency of pain crises, and prescribed the same medications.[118]  The ALJ asked the VE whether that hypothetical

---

[110] *Id.* at 50.
[111] *Id.* at 54.
[112] *Id.*
[113] *Id.* at 56-57.
[114] *Id.* at 63-70.
[115] *Id.* at 63.
[116] *Id.*
[117] *Id.* at 63-64.
[118] *Id.* at 64-65.

person could perform any available jobs involving sedentary or light work.[119]  The VE

testified there were several.[120]  At the sedentary exertional level, positions available

included a type copy examiner, addressing clerk, and bench hand.[121]  The positions of

routing clerk, final inspector, and redemption clerk are available within the light

exertional level.[122]  When the VE was questioned on whether plaintiff would be able to

perform any past work given her limitations, the VE responded in the negative.[123]

Plaintiff's counsel asked the VE whether the following situations would affect a

hypothetical individual's ability to sustain full-time employment:  impairments,

symptoms, or side-effects causing a twenty percent daily loss of work productivity;

more than three days of absences per month; regular tardiness and leaving work early;

random, unscheduled, thirty-minute breaks three to four times per day, in addition to

regularly scheduled breaks; inability to push, pull, kneel, bend, or stoop; and the need

for an hour to two-hour nap during the work day.[124]  The VE responded that each

limitation is work preclusive.[125]

### C.    The ALJ's Decision

---

[119] *Id.* at 65-66

[120] *Id.*

[121] *Id.*  All three positions are at SVP 2.  The jobs available are:  a type copy examiner, 2,400 regional and 270,800 national jobs; an addressing clerk, 1,150 regional and 156,400 national jobs; and a bench hand, 1,400 regional and 188,300 national jobs. *Id.*

[122] *Id.*  All three positions are at SVP 2.  Regarding the available jobs, a routing clerk has 2,600 regional and 512,700 national positions; a final inspector has 1,250 regional and 198,500 national jobs; and a redemption clerk has 1,100 regional and 211,200 national positions.  *Id.*

[123] *Id.* at 66.

[124] *Id.* at 68-70.

[125] *Id.*

In a detailed October 19, 2012 decision regarding plaintiff's claim, the ALJ found as follows:[126]

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2. The claimant has not engaged in substantial gainful activity since April 15, 2010, the alleged onset date (20 CFR 404.1520(c)).

3. The claimant has the following severe impairment: sickle cell disease with infrequent crises or flare-ups and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except if because of pain from her crises and otherwise, needs to have simple, routine, unskilled jobs SVP 1 or 2, and appears able to attend to tasks and complete scheduled, needing jobs that are low stress in nature and in memory and concentration, due to her medications, meaning jobs that are 1 or 2 step tasks, no production-rate pace work, with little decision making or changes in the work setting or judgment to do the work, can sit and stand for 30 minutes consistently on an alternate basis or at will for 8 hours a day and five days a week, avoiding heights and hazardous machinery, temperature and humidity extremes, with only occasional bending, stair climbing, ropes, or ladders, able to do some sedentary and light work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on September 16, 1968 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

---

[126] *Id.* at 20-32.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2010 through the date of this decision (20 CFR 404.1520(g)).

## V.  PARTIES CONTENTIONS

Plaintiff argues by improperly evaluating the medical evidence, the ALJ afforded significant weight to the opinion of the non-examining state agency reviewing physician, Dr. Anne Aldridge, rather than attributing appropriate weight to her treating specialists.[127]  She contends the ALJ ignored medical evidence concerning significant limitations in her right arm,[128] and made improper speculative inferences regarding her subjective complaints.[129]  In sum, she claims the ALJ's subjective determination of her credibility "lacks the support of substantial evidence."[130]

Defendant contends the ALJ was justified in according little weight to Drs. Lankiewicz and Goodill's assessments since neither opinion were supported by the evidence and were inconsistent with their treatment notes.[131]  Defendant points out that the ALJ properly considered the findings of Dr. Aldridge that were consistent with the

---

[127] D.I. 11 at 1, 14.
[128] D.I. 14 at 1.
[129] D.I. 11 at 18, D.I. 14 at 5.
[130] D.I. 14 at 5.
[131] *Id.* at 17-18.

record as a whole.[132]  Lastly, plaintiff's complaints, when supported by evidence, were

incorporated in the ALJ's RFC assessment and hypothetical question to the VE.[133]

## VI.    STANDARD OF REVIEW

### A.    Summary Judgment

In determining the appropriateness of summary judgment, the court must "review

the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving

party[,]' but [refraining from] weighing the evidence or making credibility

determinations."[134]  If there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law, summary judgment is appropriate.[135]

This standard does not change merely because there are cross-motions for summary

judgment.[136]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily
> justified or that the losing party waives judicial consideration and
> determination whether genuine issues of material fact exist.[137]

"The filing of cross-motions for summary judgment does not require the court to grant

summary judgment for either party."[138]

### B.    ALJ's Findings

---

[132] D.I. 13 at 15.

[133] *Id.* at 19.

[134] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[135] *See Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[136] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[137] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[138] *Krupa v. New Castle Cnty.*, 732 F. Supp. 497, 505 (D. Del. 1990).

Section 405(g) sets forth the standard of review for the ALJ's decision.[139]  The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not provide substantial evidence in support.[140]  Factual decisions are upheld if supported by substantial evidence.[141]  Substantial evidence means less than a preponderance, but more than a mere scintilla of evidence.[142]  As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[143]

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence.[144]  The court's review is limited to evidence actually presented to the ALJ.[145]  The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion."[146]  The inquiry is not whether the court would have made the same

---

[139] *See* 42 U.S.C. § 405(g).
[140] *Id.*
[141] *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Hecklem*, 806 F.2d 1185, 1190 (3d Cir. 1986).
[142] *Rutherford v. Barnhart*, 399 F.3d 546, 522 (3d Cir. 2005).
[143] *Pierce v. Underwood,* 487 U.S. 552, 565 (1988).
[144] *Monsour*, 806 F.2d at 1190.
[145] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).
[146] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

determination, but rather whether the Commissioner's conclusion was reasonable.[147] Even if the court would have decided the case differently, it must defer to the ALJ, and affirm so long as that decision is supported by substantial evidence.[148]

The agency's decision cannot be affirmed on a ground other than that actually relied upon in making the decision.[149]  In *Securities & Exchange Comm'n v. Chenery Corp.*,[150] the Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[151]  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[152]  This court's review is limited to the four corners of the ALJ's decision.[153]

## VII.    DISCUSSION

### A.    Disability Determination

Title II of the Social Security Act, 42 U.S.C. § 423(a)(I)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[154]  In order to qualify for DIB, the claimant

---

[147] *Brown v. Brown*, 845 F.2d 1211, 1213 (3d Cir. 1988).
[148] *Monsour*, 806 F.2d at 1190-91.
[149] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).
[150] *Sec. & Exch. Comm'n v. Chenery Corp.*, 322 U.S. 194, 196 (1947).
[151] *Id.*
[152] *Fargnoli v. Massanari,* 247 F.3d 34, 44 n.7 (3d Cir. 2001).
[153] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).
[154] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

must establish she was disabled prior to the date she was last insured.[155]  A "disability" is defined as the inability to do any substantial gainful activity because of any medically determinable physical or mental impairment, which either could result in death, or has lasted or can be expected to last for a continuous period of at least 12 months.[156]  To be disabled, the severity of the impairment must prevent return to previous work, and based on age, education, and work experience, restrict "any other kind of substantial gainful work which exists in the national economy."[157]

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.[158]  If a finding of disability can be made at any point in the sequential analysis, the Commissioner will not review the claim further.[159]  At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  If the claimant is so engaged, a finding of non-disabled is required.[160]  If the claimant is not, then step two requires the Commissioner to determine whether the claimant is suffering from severe impairment or a combination of impairments that is severe.  If the claimant is not suffering from either, a finding of non-disabled is required.[161]

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listing") that are

---

[155] 20 C.F.R. § 404.131.
[156] 42 U.S.C. §§ 423(d)(I)(A), 1382(c)(a)(3).
[157] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).
[158] 20 C.F.R. § 404.1520(a)(4).
[159] 20 C.F.R. § 404.1520(a)(4).
[160] 20 C.F.R. § 404.1520(a)(4)(i).
[161] 20 C.F.R. § 404.1520(a)(4)(ii).

presumed severe enough to preclude any gainful work.[162]  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.[163]  If a claimant's impairment, either singularly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five.[164]  At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work.[165]  A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [her] impairment(s)."[166]  "The claimant bears the burden of demonstrating an inability to return to [her] past relevant work."[167]

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work.[168]  At this last step, the burden rests with the Commissioner to show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience and RFC before denying disability benefits.[169]  In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments, and often seeks the assistance of a VE.[170]

---

[162] 20 C.F.R. § 404.1520(a)(4)(iii); *see also Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).

[163] 20 C.F.R. § 404.1520(a)(4)(iii).

[164] 20 C.F.R. § 404.1520(e).

[165] 20 C.F.R. § 404.1520(a)(4)(iv); *see also Plummer*, 186 F.3d at 428.

[166] *Fargnoli*, 247 F.3d at 40.

[167] *Plummer*, 186 F.3d at 428.

[168] 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *see also Plummer*, 186 F.3d at 428.

[169] *Plummer*, 186 F.3d at 428.

[170] *See id.*

### 1. Drs. Lankiewicz, Goodill, and Aldridge's Opinions

The ALJ relied on the state agency reviewing physician, Dr. Aldridge, attributing less weight to plaintiff's treating doctors, Drs. Lankiewicz and Goodill. The opinions of treating doctors are generally given more weight, if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record."[171] When there are conflicting medical conclusions, "the ALJ is not only entitled but required to choose between them."[172] The ALJ cannot reject evidence for no reason, and must explain why evidence has been rejected.[173]

In the instant matter, the ALJ explained why he afforded less weight to the opinions of Drs. Lankiewicz and Goodill, because they failed to accurately translate their treatment reports in their opinions."[174] The ALJ found that Dr. Lankiewicz consistently indicated in his treatment records that plaintiff's pain crises were infrequent, making her claims of frequent crises unsubstantiated.[175] Dr. Goodill, in his office notes, "reported the claimant with mental status alert, well groomed, not anxious, depressed, or in acute distress or sickly. . . well nourished, and well developed, [with] normal posture and gait."[176] The ALJ determined these assessments undermined Dr. Goodill's recommendation that plaintiff refrain from work for one year.

The ALJ accorded more weight to the opinion of Dr. Aldridge, because "it was

---

[171] *See* 20 C.F.R. § 404.1527.
[172] *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).
[173] *Id.* at 706-07.
[174] D.I. 8 at 30.
[175] *Id.* at 29.
[176] *Id.*

based upon thorough review of the evidence and familiarity with Social Security Rules and Regulations and legal standards set forth therein."[177]  Although Dr. Aldridge referenced the limitation in plaintiff's upper right extremity to reach overhead, the ALJ did not include this restriction in his RFC assessment and hypothetical question to the VE.[178]  Plaintiff argues that by giving significant weight to Dr. Aldridge's opinion, the ALJ was required to adopt each of the doctor's findings.  An ALJ, however, is not compelled "to incorporate into an RFC every finding made by a medical source simply because the ALJ gives the source's opinion as a whole 'significant' weight."[179]  The Commissioner, through the ALJ, is the sole arbiter of plaintiff's RFC, and may incorporate medical evidence into the RFC to the extent it is consistent with the record as a whole.[180]  The ALJ noted, for example, Dr. Gelman's reports showing plaintiff had full mobility of her shoulders prior to the removal of an "increasingly painful" and "long standing" mass.[181]  Despite this procedure, she "was allowed to return to work after a week."[182]  Therefore, the ALJ's findings are supported by substantial evidence.

### 2.    Plaintiff's Subjective Complaints

The ALJ found plaintiff's complaints "concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent" they were inconsistent with the RFC assessment.[183]  Plaintiff reported pain crises every other week lasting

---

[177] *Id.* at 30.
[178] *Id.* at 64-65.
[179] *Wilkinson v. Comm'r Soc. Sec.*, 558 F. App'x 254, 256 (3d Cir. 2014).
[180] *See* 20 C.F.R. § 404.1527.
[181] D.I. 8 at 23.
[182] *Id.*
[183] *Id.* at 28.

three to five days in duration, but the ALJ found the medical evidence "supports infrequent or occasional crisis," noting plaintiff sought emergency room treatment only three times.[184]  The ALJ further determined the medical evidence did not substantiate the degree of debilitation alleged by plaintiff, again citing the relative lack of emergency room visits and that CPAP stabilized her sleep apnea and eliminated the need for frequent daytime naps.[185]  The ALJ accounted for plaintiff's subjective complaints that were supported by the record, as evidenced by the RFC assessment in Finding 5.[186]

The ALJ considered plaintiff's need for simple, routine, unskilled, low stress jobs with an alternating sit/stand option or at will, and limitations on heights, hazardous machinery, temperature and humidity extremes, bending, and climbing stairs, ropes, and ladders.[187]  Each of these limitations were included in the hypothetical to the VE, who found plaintiff was capable of substantial gainful activity at the sedentary and light levels.  As a result, the ALJ's findings are supported by substantial evidence on the record.

**VIII.  ORDER AND RECOMMENDED DISPOSITION**

For the reasons contained herein, it is recommended that:

(1) Defendant's cross-motion for summary judgment (D.I. 12) be GRANTED

(2) Plaintiff's motion for summary judgment (D.I. 10) be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific

---

[184] *Id.*
[185] *Id.*
[186] *Id.* at 26-27.
[187] *Id.*

written objections within ten (10) days after being served with a copy of this Report and Recommendation.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Date: August 19, 2014                    /s/  Mary Pat Thynge_____
                                         UNITED STATES MAGISTRATE JUDGE