IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DESARIE GIBBS,

    Plaintiff,

v.

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Civil Action No. 1:14-cv-00134-RGA

MEMORANDUM OPINION

Sommer L. Ross, Esq., Wilmington, DE, Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, Wilmington, DE; Heather Benderson, Special Assistant United States Attorney, Wilmington, DE, attorneys for Defendant.

November 14, 2014

Andrews, U.S. District Judge:

Plaintiff, Desarie A. Gibbs, appeals the decision of Defendant, Carolyn W. Colvin, the Acting Commissioner (the "Commissioner") of the Social Security Administration (the "Administration"), which denied Ms. Gibbs' application for Social Security disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). 42 U.S.C. §§ 401-34. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g), which grants original jurisdiction to the District Courts to review a final decision of the Commissioner.

Presently pending before the Court are cross-motions for summary judgment filed by Ms. Gibbs and the Commissioner. (D.I. 11, 12). The case was referred to the United States Magistrate Judge, who issued a Report and Recommendation (D.I. 16) recommending that Gibbs' motion be denied and the Commissioner's motion be granted. Ms. Gibbs filed objections (D.I. 17) to which the Commissioner has responded. (D.I. 18). I review the objections to the Report and Recommendation *de novo*. *See Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011) (citing *Goney v. Clark*, 749 F.2d 5, 6 (3d Cir. 1984)). Ms. Gibbs has requested that the Court reverse the decision of the Commissioner and find her disabled, or in the alternative, remand this matter for a new hearing and decision. (D.I. 17, p. 9). For the reasons set forth below, the Court: (1) grants Ms. Gibbs' motion in part to remand this matter for a new hearing and decision; (2) denies Ms. Gibbs' request that this court find her disabled; (3) denies the Commissioner's motion; and (4) remands this matter to the Commissioner for a new hearing and decision consistent with this memorandum opinion.

## I. BACKGROUND

### A. Procedural History

Ms. Gibbs filed for DIB on May 5, 2010, alleging disability beginning on April 15, 2010, due to complications from sickle cell anemia, beta thalassemia, hypertension, carpal tunnel syndrome, bursitis, and a torn rotator cuff. ("Transcript" (hereafter "Tr.") 128, 137). Her application was initially denied on November 9, 2010, and denied again on April 21, 2011 after Ms. Gibbs filed for reconsideration. (Tr. 75, 81). Subsequent to the denial of Ms. Gibbs' applications, a hearing was held before an Administrative Law Judge (the "ALJ") on September 25, 2012. (Tr. 38-71). The ALJ determined that Ms. Gibbs is not disabled for purposes of the Act in a decision dated October 19, 2012. (Tr. 20-32). Ms. Gibbs sought review of the ALJ's decision in a Request for Review dated November 16, 2012. (Tr. 15). The Appeals Council denied the Request for Review on December 12, 2013, after which the ALJ's decision became the Commissioner's final decision. (Tr. 1-5). Ms. Gibbs filed this suit on February 4, 2014. (D.I. 1).

### B. Plaintiff's Medical History, Condition, and Treatment

At the time of the ALJ's decision, Ms. Gibbs was 44 years old and defined as a "younger person" under 20 C.F.R § 404.1563(c). (D.I. 16, p. 3). Ms. Gibbs completed her high school education, holds a certificate in medical billing, and has worked as a customer service representative, a data entry clerk, and an insurance clerk. (*Id.*). Due to frequent absences and exhaustion which stem from her medical difficulties, Ms. Gibbs was fired from her previous position with State Farm Insurance on April 14, 2010, and has not worked since. (Tr. 54-55; D.I. 16, p. 3). Due to her medical problems, Ms. Gibbs requires assistance from her family members to accomplish routine tasks like bathing, childcare and chores. (Tr. 44-47).

The record contains Ms. Gibbs' detailed medical history, but a summary of the pertinent facts is appropriate. Ms. Gibbs was diagnosed with sickle cell anemia and beta thalassemia in 2001, which cause her to experience vaso-occlusive pain crises. (Tr. 203, 421). She also suffers from a number of other medical conditions including hypertension, obesity, bursitis, a torn rotator cuff, carpal tunnel, and recurring pain in her hips, knees and back from sources unrelated to her sickle crises. (Tr. 201, 203, 234-41, 242, 306-14, 416-23, 484, 501). Records from Ms. Gibbs' treating physicians, supplemented by her own testimony, document reoccurring sickle cell pain crises. (Tr. 366, 571-72).

To manage her chronic pain, Ms. Gibbs visits her treating doctors on a routine basis and takes a litany of powerful medications, including Oxycontin, Percocet, Endocet, and Hydroxyurea. (Tr. 306-14, 416-23). According to Ms. Gibbs, and substantiated by consistent medical records, she experiences a pain crisis that necessitates pain medication about every other week for several days at a time. (Tr. 49, 418, 571-72, 576). Ms. Gibbs testified that she only seeks emergency room treatment in the event that her pain exceeds the capabilities of her strong medications. (Tr. 62, 456). That said, she is hospitalized for pain on average about once per year. (Tr. 176, 285, 408).

Ms. Gibbs' physical limitations and impairments due to her sickle cell pain have been documented by her treating physicians throughout her treatment history. Dr. Blatt, who treated Ms. Gibbs from 2005 until some point in mid-2010, noted that Ms. Gibbs was significantly incapacitated from her sickle cell pain and that the pain "has a major impact on her life [which] causes her to miss a great amount of work." (Tr. 238-40, 548). Dr. Goodill, who treated Ms. Gibbs from 2008 until at least 2012, described Ms. Gibbs' situation as "difficult" due to her frequent pain crises. (Tr. 571-72). Dr. Goodill opined in an impairment questionnaire that Ms.

4

Gibbs' condition has slowly worsened with time and that Ms. Gibbs would be forced to be absent from work more than three times per month going forward. (Tr. 440-46). Dr. Lankiewicz, who treated Ms. Gibbs from 2009 until at least 2012, echoed Dr. Goodill's opinion regarding Ms. Gibbs' prognosis regarding work absences due to her impairments. (Tr. 432-39). Three of Ms. Gibbs' treating doctors (Drs. Lankiewicz, Goodill, and Gelman) all confirmed that Ms. Gibbs' hip pain results, in part, from avascular necrosis of both hips. (Tr. 417, 431, 484). Treating physicians Drs. Lankiewicz and Goodill, as well as state-retained physician Dr. Aldridge, all noted Ms. Gibbs' limited ability to perform reaching and handling manipulations due to problems with her right shoulder. (Tr. 319, 436, 443).

In a Physical Residual Functional Capacity Assessment dated November 8, 2010 (the "State Assessment"), Dr. Aldridge opined that Ms. Gibbs "maintains a functionally sedentary level of activity." (Tr. 321). Dr. Aldridge responded "no" when prompted to indicate whether the statements of Ms. Gibbs' treating physicians were on file with regard to her physical capacities. (Tr. 321). This response indicates that there were either no statements from treating physicians, or that the treating sources did not opine on Ms. Gibbs' physical capacities. (Tr. 321). The State Assessment was affirmed by Dr. Vinod Kataria in a cursory statement dated April 19, 2011. (Tr. 397). On February 23, 2012, the Administration opined that Ms. Gibbs "can perform a sedentary range of work activity." (Tr. 403).

### C. ALJ's Findings and Decision

The ALJ found that Ms. Gibbs has a severe impairment, as defined by the Act, of "sickle cell disease with infrequent crises or flare-ups and obesity." (Tr. 22). In so finding, the ALJ also concluded that there was "minimal clinical evidence" to support any vocational impact by Ms. Gibbs' treatments for hypertension, carpal tunnel syndrome, bursitis and torn rotator cuff, and

5

obstructive sleep apnea. (*Id.*). The ALJ further found that Ms. Gibbs' combination of impairments was not severe enough to qualify for a Listing under the Act. (Tr. 24-26). The ALJ stated that the medical evidence did not support her statements about the frequency of her sickle cell pain crises. (Tr. 28). Additionally, the ALJ rejected the opinions of Ms. Gibbs' treating physicians because he found the opinions to be inconsistent with their treatment notes. (Tr. 29). Instead, the ALJ afforded significant weight to the State Assessment "because it was based on a thorough review of the evidence and familiarity with Social Security Rules and Regulations." (Tr. 30). Therefore, Ms. Gibbs was qualified to perform a reduced level of "light work." (Tr. 26-27). Relying on the state's vocational expert, the ALJ concluded that there were more than 1.5 million jobs in positions as a routing clerk, type copier examiner, and addressing clerk in which Ms. Gibbs could find gainful employment. (Tr. 31). Accordingly, the ALJ concluded that Ms. Gibbs was not disabled within the meaning of the Act. (*Id.*).

## II. LEGAL STANDARD

### A. Standard of Review

The District Court, upon objections being made to the Magistrate Judge's Report and Recommendation in a social security disability proceeding, will undertake a *de novo* review of the recommendations to which the objections were made. *See* 42 U.S.C. § 636(b)(1)(B); *Brown*, 649 F.3d at 195. This review requires the Court to re-examine all the relevant evidence in deciding whether to uphold or to reverse the Commissioner's finding. *See id.* Under the Act, the Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). The term 'substantial evidence' is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Quinones v. Astrue*, 672 F.Supp.2d 612, 618 (D. Del.

6

2009). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court grants deference to the Commissioner's inferences from facts so long as they are reasonable. *Monsour Med. Ctr.*, 806 F.2d at 1191 (citing *Butler Cnty. Mem. Hosp. v. Heckler*, 780 F.2d 352, 355 (3d Cir. 1985)). The Court exercises plenary review over the Commissioner's interpretation of the relevant legal precepts and their application to the facts. *Id.*

In determining whether substantial evidence supports the Commissioner's findings, the Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). The Third Circuit has explained that a:

> Single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence– particularly certain types of evidence (e.g. [evidence] offered by treating physicians)–or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (citation omitted). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)). Third Circuit decisions have recognized that there is a "particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981).

## B. Disability Determination Process

Title II of the Act, 42 U.S.C. § 423(a)(l)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). To qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen,* 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. §§ 423(d)(1)(A). A claimant is disabled "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is so engaged, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe

impairment or a severe combination of impairments. If the claimant is not suffering from a severe impairment or a severe combination of impairments, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

At step three, if the claimant's impairments are severe, the Commissioner compares the claimant's impairments to a list of impairments (the "Listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. If a claimant's impairment or its medical equivalent matches a Listing, then the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairments or combination of impairments do not appear as, or are not medically equivalent to, a Listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is work "which an individual is still able to do despite the limitations caused by her or her impairment(s)." *Fargnoli*, 247 F.3d at 40 (citations omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is able to return to her past relevant work, the claimant is not disabled. *See id.*

If the claimant is unable to return to past relevant work, step five requires the Commissioner to determine whether the impairments preclude the claimant from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 428. At this last step, the burden shifts to the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id. at* 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience" and her RFC. *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## III. DISCUSSION

Ms. Gibbs makes two arguments in her objections to the Report and Recommendation. First, Ms. Gibbs argues that the ALJ failed to properly evaluate the medical evidence because the ALJ discounted the medical opinions of her treating doctors in favor of those of the state agency physicians. Second, she argues that the ALJ failed to properly account for her subjective complaints of pain because they are supported by her medical records. As I will explain below, I agree with both of Plaintiff's arguments.

### A. The ALJ Erred in Failing to Follow the Treating Physician Rule

The Plaintiff first argues that the ALJ failed to properly evaluate the medical evidence with regards to the frequency of Ms. Gibbs' crises. (D.I. 11, p. 14). As Plaintiff correctly points out, this is "the major issue in this case," because the frequency of Ms. Gibbs' crises determines whether she meets or exceeds the criteria of a Listing. (*Id.* at p. 16). In determining whether Ms. Gibbs' impairments met or medically equaled a Listing for step three of the disability analysis, the ALJ considered the requirements for sickle cell, which indicate, in relevant part, that in order to qualify a claimant must demonstrate one of the following:

  A. Documented painful (thrombotic) crises occurring at least three times during the 5 months prior to adjudication; or

  B. Requir[ed] extended hospitalization (beyond emergency care) at least three times during the 12 months prior to adjudication; or

10

C. Chronic, severe anemia with persistence of hematocrit of 26 percent or less.

20 C.F.R. § 404, Subpart P, Appendix 1, § 7.05. With regards to sickle cell, the Listing indicates that "Vaso-occlusive . . . episodes should be documented by description of severity, frequency, and duration."[1] *Id.* § 7.00.

The ALJ specifically found that "the record does not report the existence of any specific symptoms, functional limitations and/or diagnostic test results, which would suggest that [Ms. Gibbs'] impairments meet or equal the criteria" of the Listing. (Tr. 25). The ALJ concluded that "the frequency of the documented crises does not satisfy the listing . . . [and h]er sickle cell related symptoms respond well to medication and have been associated with only mild anemia." There are two problems with the ALJ's conclusions in this regard. First, in reviewing the medical evidence, it is hard to understand how the ALJ was able to conclude Ms. Gibbs failed to meet the "three crises" requirement under the Listing given her treatment history—this is due, in part, to the fact that the ALJ failed to clearly explain the reasons for rejecting otherwise probative medical evidence from Ms. Gibbs' treating physicians. Second, the ALJ failed to accord appropriate weight to the opinions of Ms. Gibbs treating physicians, who all paint relatively consistent pictures of her history of sickle cell crises. I will address these arguments in turn.

### i. The ALJ Erred in Failing to Adequately Explain the Reasons for Rejecting Probative Medical Testimony

A review of the ALJ's determination in step three[2] indicates a speculative, and at times, incorrect portrayal of the medical evidence supporting Ms. Gibbs' DIB claim. An ALJ's failure to mention and explain contradictory medical evidence within the record is error. *See Burnett*,

---

[1] I understand "thrombotic" and "vaso-occlusive" to mean the same thing.

[2] In step three, discussed *supra*, the ALJ determines whether the claimant's impairment or combination of impairments is medically equivalent to a Listing; if so, the claimant is disabled, if not, the analysis continues.

11

220 F.3d at 122 (reversing decision when ALJ discussed some objective medical evidence in making determination but failed to consider other objective medical evidence inconsistent with the opinion). In weighing the medical evidence, an ALJ "must make specific findings as to all of the pertinent medical evidence, reconciling conflicts and, if rejecting particular evidence, explaining why." *Id.* at 126. It is imperative that an ALJ cogently and clearly explain the reasons for rejecting probative evidence, for his explanation is the only way a reviewing court can evaluate the propriety of the reasons for the rejection. *See Cotter*, 642 F.2d at 706. An ALJ cannot reject the opinion of a treating physician based on "speculative inferences from medical reports, and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence . . . not due to his or her own credibility judgments, speculation, or lay opinion." *Morales v. Apfel*, 225 F.3d, 310, 317 (3d Cir. 2000) (citing *Plummer*, 186 F.2d at 429). An ALJ "may not reject [a physician's findings] unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).

The ALJ failed to adequately explain the reasons for rejecting Dr. Goodill's conclusions, which, to me, appear to be based on a substantial and relatively consistent documented treatment history. The ALJ determined that Dr. Goodill failed to translate his treatment reports into his conclusions because Ms. Gibbs appeared for an office visit (or two) with "mental status alert, well groomed, not anxious, depressed, or in acute distress or sickly. Well nourished, and well developed, normal posture and gait." (Tr. 29). There is, at best, a tenuous connection between Ms. Gibbs' appearance at a couple of appointments, and the accuracy and credibility of Dr. Goodill's conclusions. In fact, making a credibility determination regarding the opinion of Dr. Goodill based on Ms. Gibbs' appearance at an office visit is the exact kind of speculative

12

conclusion that *Morales* rejects. As *Burnett* makes clear, the ALJ cannot reject what the record clearly indicates to be at least four years of treatment with a doctor who carefully documented Ms. Gibbs' frequent crises, consistent use of pain medication, and "a difficult situation"—to use Dr. Goodill's own words—on the basis that Ms. Gibbs was occasionally "well groomed" and not obviously sick.

The ALJ similarly found that Dr. Lankiewicz failed to accurately translate his treatment reports into his ultimate opinion regarding Ms. Gibbs' condition. As support for this conclusion, the ALJ indicated that "the limitations that Dr. Lankiewicz assessed, however, were indicated to be present, and he does not predate them to the alleged onset or any other time previous" and as such, that "little weight can be afforded [Dr. Lankiewicz's] opinion because it would not satisfy the durational criteria." (Tr. 29). It appears that the ALJ based these conclusions on a Medical Impairment Questionnaire filed out by Dr. Lankiewicz on March 20, 2012. (Tr. 432-39). The durational requirement under the Act is fulfilled if the disability is expected to last for a period of at least 12 months. Dr. Lankiewicz indicated "yes" when prompted, "Are your patient's impairments ongoing, creating an expectation on your part that they will last at least twelve months?" (Tr. 437). It is unclear to me how, without more, the ALJ could expressly reject Dr. Lankiewicz's conclusion when the Multiple Impairment Questionnaire is the only place Dr. Lankiewicz opines on duration. Again, the ALJ cannot, in line with precedent, reject the opinions of a claimant's treating physicians with blanket assertions that are unsupported by clear explanation and medical evidence.

With regards to the ALJ's portrayal of Dr. Lankiewicz's treatment notes, he is correct in pointing out that, at times, Dr. Lankiewicz indicated that Ms. Gibbs' crises were "sporadic," "occasional," and that "she has had a relatively uneventful interval history," but Dr. Lankiewicz

13

never indicated the context of these terms. (Tr. 418, 420-21). Dr. Lankiewicz also observed in his treatment notes that "per usual, [Ms. Gibbs] reports multiple vasoocclusive crises" and that "Ms. Gibbs is a 42 year old woman with sickle beta thalassemia and frequent pain crises." (Tr. 418, 423). Given this record, it was inappropriate for the ALJ to conclude that "[Dr. Lankiewicz] is consistent in his records of indicating that her pain crises are not frequent." (Tr. 29).[3]

The record demonstrates that there are inconsistencies in Dr. Lankiewicz's use of terminology. While it is within the purview of an ALJ to resolve inconsistencies in medical testimony by crediting contrary medical evidence, an ALJ cannot reject medical testimony by relying on his own credibility judgments[4] or lay opinion. Only when an ALJ considers whether a treating physician's opinion is contradicted by other medical evidence in the record can the ALJ properly decide how much weight to afford the opinion. Here, the ALJ should have resolved the inconsistencies in Dr. Lankiewicz's treatment notes within the context of the remainder of the record. When considered against this backdrop, Dr. Lankiewicz's indications of Ms. Gibbs' multiple and frequent pain crises are more supported than his references to sporadic and inconsistent crises.[5]

---

[3] One of the Administration's reviewers, Lakisha Lett (whose exact role in the review process is not clear), indicated that "the medical evidence in the file reveals back in 2009 [Ms. Gibbs] had pain attacks at least twice a month." (Tr. 403). This conclusion only serves to bolster Ms. Gibbs' claim that she meets the criteria for the sickle cell Listing—three documented crises in five months.

[4] While credibility judgments are normally for the ALJ to make, this is not so with medical testimony. An ALJ may only reject a physician's opinion by using contrary medical evidence, and may not do so on the basis of a credibility determination. *See Morales*, 225 F.3d at 317.

[5] I say this not because "multiple" and "frequent" are inherently less vague than "sporadic" and "inconsistent," but rather because Dr. Lankiewicz's notation of frequent crises makes sense when considered in tandem with other relevant medical testimony in the record. To illustrate, consider that Dr. Goodill specifically noted that plaintiff was using OxyContin twice monthly for three to five days at a time in November 2010. (Tr. 576). Dr. Goodill also indicated that Ms. Gibbs' pain crises were occurring every other week and lasting three to five days, and that she had used 20-30 OxyContin to manage her pain the previous week, in August 2011. (Tr. 571-72). Dr. Goodill's

14

Finally, in considering Ms. Gibbs' treatment records from the Singson Medical Group, the ALJ indicated "no diagnosis of sickle cell noted in the records from 2006 to 2010." (Tr. 25). This is erroneous. The records indicate that not only did each treatment record from Singson indicate the presence of Ms. Gibbs' sickle cell trait; each record indicated a sickle cell diagnosis—on January 2, 2008, May 7, 2008, June 3, 2009, and July 8, 2009. (Tr. 270, 272-73, 275-76, 278-79, 281).

### ii. The ALJ Erred in Failing to Follow the Treating Physician Rule and in Substituting His Own Lay Opinion for that of a Medical Professional

The ALJ accorded too much weight to the opinion of the state agency's medical consultants in light of the medical testimony received from Ms. Gibbs' treating physicians. Additionally, the ALJ improperly concluded that Ms. Gibbs is capable of light work without adequately rejecting the contrary medical evidence. In evaluating medical testimony, the ALJ must give the "opinions of a claimant's treating physician . . . substantial and at times even controlling weight." *Fargnoli*, 247 F.3d at 43. This is especially true when the treating physician's "opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer*, 186 F.3d at 429. "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Id.* In weighing the opinions of a claimant's treating physicians against the opinions of non-treating physicians, "the scales must tip even more in the treating physician's favor when the non-treating physician's opinion is rendered without the benefit of a complete record." *Dougherty v. Astrue*, 715 F.Supp.2d 572, 582 (D. Del.

---

observations of frequency support Dr. Lankiewicz's indications of "multiple" and "frequent," and not Dr. Lankiewicz's use of "sporadic" or "occasional." The ALJ should have decided which of Dr. Lankiewicz's conflicting statements were supported by other medical evidence instead of rejecting his opinion outright.

15

2010). It is well-established principle that an ALJ cannot substitute his opinion for that of a medical professional. *Morales*, 225 F.3d at 319.

In considering the weight to afford the medical testimony in the record, the ALJ must consider and clearly resolve inconsistencies between a claimant's treating physicians and that of the state agency physicians. That did not happen here. If the default rule is that strong, even controlling, weight must be given to a claimant's physicians, it follows that such a presumption may only be overcome with specific findings founded in contradictory medical evidence. The ALJ affirmatively chose to give "significant weight" to the opinion of the state agency physicians, specifically the State Assessment, but offered no reason to support this decision beyond a conclusory statement that the state agency physicians thoroughly reviewed the evidence and had knowledge of the regulations.[6] A review of the competing opinions highlights major discrepancies between the State Assessment completed by Dr. Aldridge and the Multiple Impairment Questionnaires filled out by Drs. Lankiewicz and Goodill. Dr. Lankiewicz treated Ms. Gibbs for at least three years; Dr. Goodill treated Ms. Gibbs for at least four years. Dr. Aldridge reviewed records and reached a conclusion based on her review. Given the drastic difference in experience treating Ms. Gibbs, it would seem that Drs. Lankiewicz and Goodill would have had a much better understanding of Ms. Gibbs' condition and limitations than Dr. Aldridge. To the extent that a state agency physician's opinion can be given great weight over

---

[6] As a sidenote, I question how the ALJ had any evidence, let alone substantial evidence, to characterize the review made by the state agency physicians as "thorough." For one, Dr. Aldridge never addresses why her conclusions differ from the conclusions of Ms. Gibbs' treating physicians. Dr. Aldridge filled out the State Assessment on November 8, 2010, which predates the reports of Dr. Lankiewicz (dated March 20, 2012) and Dr. Goodill (dated April 11, 2012), but Dr. Aldridge still would have had to review all of the treatment notes from Drs. Lankiewicz and Goodill to reach her conclusions. These treatment records are replete with documented pain crises and observations regarding Ms. Gibbs' inability to hold a job. Dr. Vinod K. Kataria, who affirmed Dr. Aldridge's report on April 19, 2011, also failed to address the discrepancies between Dr. Aldridge's report and the relevant treatment records. (Tr. 397). Lakisha Lett, who reviewed the determinations of Dr. Aldridge for the Administration on February 2, 2012, never requested an additional medical review of the evidence in light of the contradictions. (Tr. 403).

16

that of the claimant's treating physicians, the ALJ has not properly explained the circumstances that would warrant such weight here. Thus, it was error for the ALJ to accord great weight to the opinion of the state agency physicians.

Since the ALJ afforded the state agency physicians too much weight without adequately explaining his reasons for rejecting the opinions of Ms. Gibbs' treating physicians, it was error for the ALJ to conclude Ms. Gibbs is capable of light work. Dr. Lankiewicz' conclusions indicate that Ms. Gibbs would be precluded from performing even a sedentary level of activity in the workplace.[7] (Tr. 432-39). Dr. Goodill's conclusions indicate that Ms. Gibbs would be able to complete some sedentary work activities.[8] (440-46). Finally, Dr. Aldridge's assessment indicates "that [Ms. Gibbs'] maintains a functionally sedentary level of activity," but her assessment also indicates Ms. Gibbs' lifting ability was sufficient to support a finding that Ms. Gibbs could perform at least some light work activity.[9] (Tr. 318, 321). The ALJ concluded that he "finds that the claimant has the residual functional capacity to perform light work." (Tr. 26). The ALJ made this conclusion without properly explaining the reasons for discounting the reports of the treating physicians, and in so doing, improperly substituted his opinion for that of the medical professionals.

---

[7] The lowest level of work defined by the Act, "sedentary work," requires lifting "no more than 10 pounds at a time" and also includes a certain amount of walking and standing. 20 C.F.R. § 404.1567(a). Dr. Lankiewicz opined that Ms. Gibbs can never lift or carry anything. (Tr. 435). Dr. Lankiewicz also indicated Ms. Gibbs would have trouble sitting beyond one hour and standing for periods less than one hour during a normal workday. (Tr. 434).

[8] Dr. Goodill opined that Ms. Gibbs could occasionally lift or carry up to ten pounds, but would have trouble sitting beyond two hours and standing for periods less than one hour during a normal workday. (Tr. 442-43).

[9] The Act defines "light work" as that which "involves lifting no more than 20 pounds at a time" with "frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. § 404.1567(b). Light work also requires "a good deal of walking or standing" or "sitting most of the time" with manipulation of arm or leg controls. *Id.* Dr. Aldridge stated that Ms. Gibbs could occasionally lift 20 pounds, frequently lift 10 pounds, and sit or stand in combination for an eight hour workday. (Tr. 318). As an aside, I cannot understand how a doctor can confidently state, for a person whom the doctor has never met, how much the person can lift. I accept, nevertheless, that this is possible.

17

## B. The ALJ Erred in Failing to Adequately Credit Plaintiff's Subjective Complaints

The ALJ improperly rejected Ms. Gibbs' subjective complaints without adequately considering medical records that supported her testimony. The Third Circuit's four-part standard is instructive in evaluating a claimant's subjective complaints of pain. *See Whitmore v. Barnhart*, 469 F.Supp.2d 180, 189 (D. Del. 2007). In evaluating a claimant's subjective complaints, an ALJ must heed the following:

> "(1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence; (2) that subjective pain may support a claim for [DIB] and may be disabling; (3) that where such complaints are supported by medical evidence, they should be given great weight; and (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount the claimant's pain without contrary medical evidence."

*Id.* (quoting *Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984)). "Where medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Mason*, 994 F.2d at 1067-68.

The ALJ included most of Ms. Gibbs' subjective complaints in his opinion, but rejected her allegations regarding the intensity, persistence, and limiting effects of her symptoms because "the medical evidence of record does not substantiate such degree of debilitation." (Tr. 28). Specifically, the ALJ summarized the records as indicating "her crises are not frequent and there are few times documented that it has been severe enough to seek emergency room treatment." (*Id.*). While frequent emergency room visits would be probative of frequency and severity of the attacks, under the circumstances of this case, where it is undisputed that Ms. Gibbs treated her crises at home with pain medication, the absence of emergency room visits has little probative value in demonstrating lack of frequency and severity. This is especially true in light of Ms.

18

Gibbs' testimony, supported by her treating physicians, that Ms. Gibbs only seeks treatment in the event that her pain crises overwhelm her pain management regimen, which has been honed across years of treatment. Additionally, the medical records do, at times, substantiate Ms. Gibbs' claims.[10] In each instance that Ms. Gibbs' statements are supported by medical evidence, the ALJ must accord her claims great weight unless he specifically finds that they are contradicted by medical evidence in the record. Since I find that the two reasons the ALJ cited to reject Ms. Gibbs' subjective complaints are insufficient, on remand, part of the ALJ's re-evaluation of the medical testimony must involve a reconsideration of Ms. Gibbs' subjective complaints in light of supporting evidence in the record. If the ALJ finds reason to doubt or reject Ms. Gibbs' complaints, he must specifically state his reasons, supported by contrary medical evidence, for doing so.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment is granted with regards to the petition for a new hearing and decision consistent with this memorandum opinion, and denied with regards to a finding by this Court that she is disabled.[11]

An appropriate order will be entered.

---

[10] As an illustrative example, consider that Ms. Gibbs alleged that she experienced pain crises every other week for a period of 3 to 5 days per crisis. (Tr. 60). These statements echo an exact finding of Dr. Goodill in his treatment notes from 2011. (Tr. 571). Additionally, Dr. Lankiewicz discusses Ms. Gibbs' "usual pain crises" and her reliance on Percocet to manage the pain in 2012. (Tr. 417). In this instance, Ms. Gibbs' claims regarding the frequency of her pain should have been accorded great weight, since they find support in the medical records.

[11] The gist of this Opinion is that the ALJ did not sufficiently explain his conclusions. It is appropriate that the ALJ reconsider the issues in light of the governing law.